UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at ASHLAND

| | |
|---|---|
| LILLY VINSON, ET AL., )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>LUPIN PHARMACEUTICALS, INC., )<br>Defendant. )<br> )<br> ) | **Civil Action No. 0:10-cv-00114-HRW**<br>**The Honorable Henry R. Wilhoit, Jr**. |

**MEMORANDUM IN SUPPORT OF
LUPIN PHARMACEUTICALS, INC.'S
MOTION TO DISMISS AMENDED COMPLAINT**

**I.     INTRODUCTION**

In the Amended Complaint ("AC")[1], Plaintiffs assert claims based on state law failure to warn theories of recovery against Defendant Lupin Pharmaceuticals, Inc. ("Lupin").  However, these claims are preempted by federal law and must be dismissed.

Plaintiffs allege that they were purportedly harmed by taking a generic prescription drug manufactured by Lupin called Simvastatin 80.  (AC ¶¶ 28, 53-54). Each of Plaintiffs' claims are based on an alleged failure by Lupin to warn consumers of the risks of developing rhabdomyolysis from use of Simvastatin 80.

Sister courts in this Circuit, specifically the Western District of Kentucky, have held that state law failure to warn claims against *generic* pharmaceutical manufacturers are preempted because federal law requires generic manufacturers to have the "same" labeling as the brand manufacturer at approval and to have labeling that is "consistent

---

[1] As discussed in Paragraphs i-iv of the Amended Complaint, Lupin Pharmaceuticals, Inc. was not served with the Original Complaint.

with" the brand manufacturer's labeling thereafter-- making it impossible for generic manufacturers to both unilaterally change or modify their labeling to meet state law concerns (assuming they could so at all) and at the same time comply with federal law by having labeling that is the same as and consistent with a brand manufacturer's labeling. *See Morris v. Wyeth*, 582 F. Supp. 2d 861 (W.D. Ky. Oct 24, 2008); *Wilson v. Wyeth*, 2008 WL 4696995 (W.D. Ky. Oct 24, 2008); and *Smith v. Wyeth*, 2008 WL 4697002 (W.D. Ky. Oct. 24, 2008).[2]

Despite the strong reasoning presented by the Western District of Kentucky, the Eighth and Fifth Circuits held differently in *Mensing v. Wyeth, Inc.,* 588 F.3d 603 (8th Cir. 2009) and *Demahy v. Actavis*, 593 F. 3d 428 (5th Cir. 2010)[3], respectively; both decisions were promptly appealed to the U.S. Supreme Court. Notwithstanding the fact that the Fifth and Eight Circuits were in accord and the U.S. Solicitor General recommended to the High Court, upon its request, that the Court decline review until a circuit split arose, in December 2010, the U.S. Supreme Court granted certiorari to decide the very question that is now before this court. *See Actavis Elizabeth, LLC v. Gladys Mensing*, No. 09-1039, 131 S.Ct. 817 (U.S. 2010); consolidated with, *PLIVA,*

---

[2] All three cases were appealed to the Sixth Circuit and are currently awaiting disposition. In the interim, the Northern District of Ohio in *Fulgenzi v. Wyeth, Inc.*, 686 F. Supp. 2d 715 (N.D. Ohio 2010), decided not to follow the Western District of Kentucky, and instead adopted the reasoning of the Eighth Circuit in *Mensing v. Wyeth, Inc*., 588 F.3d 603 (8th Cir. 2009) (now before the U.S. Supreme Court) holding that state law failure to warn claims against a generic manufacturer were not preempted by federal law. The Eight Circuit in *Mensing* premised its holding on the application of *Wyeth v. Levine*, 129 S.Ct. 1187 (2009) (failure to warn by brand manufacturer); however, *Levine* was expressly considered by the Western District of Kentucky and found to not alter the court's analysis. *See Wilson v. Wyeth, Inc.*, 2009 WL 736198 (W.D. Ky. March 4, 2009). Furthermore, *Levine* is likely not persuasive as to the liability of a generic manufacturer given that *Levine* involved only a brand manufacturer and especially in light of the fact that the U.S. Supreme Court granted certiorari to review *Mensing* despite the Court's holding in *Levine*.

[3] Judge Russell in the Western District of Kentucky expressly considered the District Court's holding in *Demahy* (which was subsequently upheld in the Fifth Circuit opinion now before the U.S. Supreme Court), and *rejected* it in *Morris v. Wyeth, Inc.*, 642 F. Supp. 2d 677, 683-685 (W.D. Ky. 2009) (denying a motion for reconsideration based on the district court's finding of preemption of state failure to warn claims involving generic drugs.).

*Inc. v. Mensing*, No. 09-993, 131 S.Ct. 817 (U.S. 2010); *Actavis, Inc. v. Demahy*, No. 09-1501, 131 S.Ct. 817 (U.S. 2010).[4] The U.S. Supreme Court's decision to hear the matter now underscores the significant policy implications should preemption be found not to apply.

For the reasons stated herein, Plaintiffs' state law failure to warn theories of recovery are preempted. Because each of Plaintiffs' claims are predicated upon Lupin's purported failure to warn, Lupin respectfully requests that the Court dismiss Plaintiff's Amended Complaint in its entirety with prejudice.

## II. STATEMENT OF FACTS

Plaintiffs allege that as a result of Mrs. Vinson's use of Simvastatin 80, the generic equivalent of Zocor, which is allegedly manufactured and marketed by Lupin, she was diagnosed with rhabdomyolysis. (AC ¶¶ 28, 31-33, 54-55). Plaintiffs allege that Mrs. Vinson began taking Simvastatin in or around July or August 2009 (AC ¶ 52), and she was diagnosed with rhabdomyolysis on or about November 6, 2009. (AC ¶ 54).

Plaintiffs assert various theories of recovery, including strict products liability based on defective design and failure to warn, negligence based on defective design and failure to warn, breach of implied warranty, personal injury and loss of consortium and household services. Yet each of these theories of recovery remains premised upon Plaintiffs' allegation that Lupin failed to adequately warn of the risks allegedly associated with its product -- specifically, the risks of developing rhabdomyolysis. (*See* AC generally and with respect to design defect claims, ¶ 46 ("Simvastatin 80 is a defective and therefore unreasonably dangerous product, ***because its labeling fails to adequately warn*** consumers and prescribers of the exponentially increased risk of

---

[4] Oral argument is currently scheduled for March 30, 2011.

developing rhabdomyolysis it poses."), implied warranty claim, ¶ 50("Mrs. Vinson reasonably relied on the belief that Simvastatin 80 is reasonably safe…), personal injury and loss of consortium claims, ¶ 56 ("The defendant's conduct,…as set forth in any one…bases of liability…substantially contributed to causing Mrs. Vinson's development of rhabdomyolysis.").

Plaintiffs fail to allege that Lupin's labeling and the chemical composition for generic Simvastatin is the same as the labeling and chemical composition for its brand-name counterpart Zocor. However, Plaintiffs allege that "[a]fter the expiration of Merck's patent on Zocor, the defendant obtained FDA approval to manufacture and sell Simvastatin as a generic drug in the United States." (AC ¶ 33). As explained below, there can be no dispute that the Hatch-Waxman Act and the FDA's implementing regulations require each generic drug to be "the same as" its branded equivalent in all material respects - including the chemical composition of its active ingredient, its dosage form, its strength, its route of administration, the rate and extent to which it delivers the active ingredient to patients, and its labeling (including its warnings, whether affixed to the product or disseminated through other means). Plaintiffs are apparently advocating for "stronger" warnings - a claim that is preempted by federal law.

### III. LEGAL ARGUMENT

#### A. State Law Claims Must Be Dismissed When Preempted By Federal Law, Rules, And/Or Regulations

State law, including failure to warn law, that conflicts with federal law is "without effect." *See Maryland v. Louisiana,* 451 U.S. 725, 746 (1981); *see also* U.S. Const. art. VI, cl. 2.

Conflict preemption occurs "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.'" *United States v. Locke,* 529 U.S. 89, 109 (2000) *(quoting California v. ARC Am. Corp.,* 490 U.S. 93, 100-101 (1989) (citations omitted)); *Morris v. Wyeth, Inc.,* 642 F. Supp. 2d at 681. "Pre-emption fundamentally is a question of congressional intent." *English v. Gen. Elec. Co.,* 496 U.S. 72, 78-79 (1990).

### B. Federal Law, Rules And Regulations Treat Brand Manufacturers And Generic Manufacturers Differently

#### 1. Federal regulation of the marketing and sale of drugs

Marketing of prescription drugs in interstate commerce in the United States is governed by the federal Food, Drug, and Cosmetic Act ("FDCA"). *See* 21 U.S.C. § 393. Congress vested the federal Food and Drug Administration ("FDA") with authority to promulgate regulations for the enforcement of the FDCA. *See* 21 U.S.C. § 371. Those regulations are published in Title 21 of the Code of Federal Regulations. The FDCA and the regulations promulgated by the FDA set forth a comprehensive federal regulatory scheme designed to ensure the safety and efficacy of drugs marketed for human consumption.

Under the FDCA, a drug may not be marketed in interstate commerce unless an approved application filed pursuant to 21 U.S.C. § 355(b) or § 355(j) is effective. *See* 21 U.S.C. § 355(a). Section 355(b) applies to new drugs and requires the submission of a new drug application ("NDA").[5] Section 355(j) applies to generic versions of drugs

---

[5] Drugs previously approved for marketing under an NDA that serve as the basis for a generic drug application or ANDA are known as "listed drugs" or "reference listed drugs."

- - 5

previously approved under an NDA and requires the submission of an abbreviated new drug application ("ANDA").

### 2. Overview of federal regulation of brand manufacturers' labeling, and post-approval labeling of a new drug

The FDA's review of an NDA is rigorous and the drug approval process spans many years. Even before an NDA is submitted, the manufacturer must submit an investigational new drug ("IND") application to obtain authorization to conduct the clinical trials necessary to establish the safety and efficacy of the production for a particular use; *i.e.,* for the treatment of a specific condition or disease. *See* 21 U.S.C. § 355(i); 21 C.F.R. § 312.20. In support of an IND filing, the manufacturer must submit pre-clinical research relating to the safety and efficacy of the product, including "pharmacological and toxicological studies of the drug involving laboratory animals or in vitro." 21 C.F.R. § 312.23(a)(8); *see also* 21 C.F.R. § 312.23(a). Only after the results of the clinical studies conducted during the IND phase demonstrates the safety and efficacy of the product may the manufacturer submit an NDA for approval.

The importance of labeling to the NDA approval process is evidenced by the FDCA provision mandating when the FDA must deny an application. Specifically, the FDCA prohibits the FDA from approving a new drug application if: (1) the clinical investigations do not show the "drug is safe for use *under the conditions* prescribed, recommended, or suggested *in the proposed labeling;*" (2) the test results show either the "drug is unsafe for use under such conditions or do not show that [the] drug is safe *under such conditions;*" (3) there is "insufficient information to determine whether [the] drug is safe for use *under such conditions;*" (4) "there is a lack of substantial evidence

- - 6

that the drug will have the effect it purports or is represented to have *under the conditions* of use prescribed, recommended, or suggested *in the proposed labeling;"* or (5) "based on a fair evaluation of all material facts, such *labeling is false or misleading* in any particular." 21 U.S.C. § 355(d) (emphasis added.) In each instance, approval is linked to the labeling. The FDA has by regulation specified the general and specific requirements for the content and format of labeling of new drugs under an NDA. *See generally* 21 C.F.R. §§ 201.56 & 201.57.

Significantly, a pharmaceutical product's labeling reflects the careful balance the FDA strikes between notifying users of potential dangers associated with the product, while not deterring beneficial uses by overwarning. *See Requirements on Content and Format of Labeling for Human Prescription Drugs and Biological Products - Final Rule* ("2006 Final Rule"), 71 Fed. Reg. 3922, 3935 (Jan. 4, 2006). "Exaggeration of risk could discourage appropriate use of a beneficial drug," and concomitantly cause harm to the public. *Id.*

Following approval, brand manufacturers are required to maintain records, conduct additional testing as directed, and advise the FDA of significant adverse health consequences reported following the drug's introduction into the market. *See* 21 U.S.C. § 355(k); 21 C.F.R. § 314.80. Before making changes to any labeling after approval, however, the applicant must submit, and the FDA must approve, a "supplement" describing the changes. 21 C.F.R. § 314.70.

The rule does have a limited exception allowing an applicant to make "[c]hanges in the labeling . . .[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(6)(iii)(A). In such a case, "the holder of an

approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change," rather than waiting for the FDA to approve it. 21 C.F.R. § 314.70(c)(6). This is known as a "changes being effected" or "CBE" supplement. 21 C.F.R. § 314.70(c)(3). The FDA, however, may ultimately disapprove a change made through the CBE process, in which case "it may order the manufacturer to cease distribution of the drug product(s) made with the . . . change." 21 C.F.R. § 314.70(c)(7).

If, following approval of a drug, the FDA finds that "clinical or other experience, tests, or other scientific data show that such drug is unsafe for use" or, "on the basis of new information," the labeling is "false or misleading in any particular," the FDA must withdraw the drug's approval. 21 U.S.C. § 355(e).

Generally, by the time a patent on new drug product expires and the product is eligible for generic versions, the drug's safety profile has been well established through the approval process for the NDA and the FDA's post-marketing surveillance of the drug's use for a period of several years following approval.

### 3. **The Hatch-Waxman Act imposes a different approval and labeling scheme for generic manufacturers**

The Drug Price Competition and Patent Term Restoration Act, codified as 21 U.S.C. § 355(j), (referred to as the "Hatch-Waxman Amendments" to the Food, Drug and Cosmetic Act (FDCA) or the "Hatch-Waxman Act"), sets forth a process under which any person may file with the Secretary of Health and Human Services an *abbreviated* application for the approval of a generic drug. 21 U.S.C. § 355(j)(1). Rather than the expensive data and analysis required of a full blown NDA by Section 355(b), an ANDA must show that the

- - 8

conditions for use prescribed, recommended, or suggested in the labeling have been previously approved for a listed drug and that each of a number of specified characteristics of the new drug is "the *same as* that of the listed drug." 21 U.S.C. § 355(j)(2)(A) (emphasis added). These characteristics include the drug's active ingredient, route of administration, dosage form, strength, and **labeling**. *Id.*

The Hatch-Waxman Act, then, authorizes the approval of a new drug without demanding the information that would otherwise be required in an application under subsection (b), *i.e.,* the reports of safety and effectiveness investigations, provided the same drug has been previously approved for the same conditions under the more rigorous process. As one committee report on the Act noted, its "focus . . . is to provide the Food and Drug Administration (FDA) with sufficient information to assure the generic drug is the same as the listed drug that has previously been determined to be safe and effective." H.R. Rep. No. 98857, pt. 1 at 21 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2654.

Indeed, the overriding purpose of amending the FDCA to codify and implement a statutory ANDA procedure was to increase the availability of low-cost generic drugs. *See* H.R. Rep. No. 857 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647; *New Drug Application: Hearings on H.R. 3605 Before the Subcomm. On Health and the Environment of the House Comm. On Energy and Commerce,* 98th Cong., 1st Sess. (1983); Drug Price Competition and Patent Term Restoration Act of 1984, Committee Notes, 130 Cong. Rec. 24416, H.R. 3605 (daily ed. Sept. 6, 1984); Drug Price Competition and Patent Term Restoration Act, Committee Notes, 130 Cong. Rec. 24970, S. 1538 (daily ed. Sept. 12, 1984).

The FDA later proposed amending its regulations to implement the ANDA procedure set forth in the Hatch-Waxman Act.  *See* Abbreviated New Drug Application Regulations, 54 Fed. Reg. 28872 (proposed July 10, 1989).  In relevant part, the FDA proposed "to add a ***new requirement*** with respect to the submission of labeling" as part of an ANDA to effect Hatch-Waxman's rule that an ANDA "show that the proposed labeling for its drug product is ***the same as*** that of the reference listed drug." *Id.* at 28884 (emphasis added).  The FDA then promulgated rules specifying that an ANDA must include "a statement that the applicant's proposed labeling is ***the same as*** that for the reference listed drug . . . ." 57 Fed. Reg. 17950, 17985-6 (Apr. 28, 1992) *(later codified* at 21 C.F.R. §§ 314.94(a)(8)(iii)-(iv) (1993)) (emphasis added).

These new rules required the FDA to deny an ANDA if it is insufficient to show that the labeling proposed for the drug "is the same as" the reference listed drug and, after an ANDA has been approved, it is found that "the labeling for the drug product that is the subject of the [ANDA] is ***no longer consistent with*** that for the listed drug." 21 C.F.R. § 314.150(b)(10) (emphasis added).

    C.    <u>**It Is Impossible For Generic Manufacturers To Unilaterally Modify Their Labeling To Comply With State Failure To Warn Law Without  Violating Federal Law, Rules, And Regulations**</u>

As held by this court's brethren in the Western District of Kentucky, the clear language and intent of the Hatch-Waxman Act and the regulations promulgated thereunder is that the CBE process, *i.e.,* unilateral labeling changes, does *not* apply to generic drug manufacturers but rather only to brand manufacturers.  *See Morris v. Wyeth,*

- -                                                                                                                              10

*Inc.,* 642 F. Supp. 2d at 682-85 (finding that "federal regulation of brand and generic drug labeling differs significantly" and that, unlike brand manufacturer, generic manufacturer may not unilaterally change its labeling under CBE procedure without running afoul of federal law and regulations), *aff'd, Morris*, 2009 WL 736200 (reconsideration denied); *Wilson ,* 2008 WL at *5-*7; *Smith v. Wyeth, Inc.,* 2009 WL 425032, *6 (W.D. Ky. Feb. 20, 2009) (denying a motion for reconsideration based on the district court's finding of preemption of state failure to warn claims involving generic drugs.)*; Masterson v. Apotex, Corp.,* 2008 WL 3262690, *4 (S.D. Fla. Aug. 7, 2008) (granting motion to dismiss on federal preemption grounds based on finding that "[u]nlike a manufacturer of a listed drug, a generic manufacturer has a limited ability to even suggest a labeling change, subject solely to the discretion of the FDA to change the labeling for both the generic and the listed drug" and, therefore, "compliance with a state law duty to warn would conflict with the federal statutory scheme").

The fact that the federal statutes and regulations do not allow generic manufacturers to avail themselves of the CBE process to unilaterally change their labels given the "same as" requirement "is reinforced by a footnote in the FDA's 2008 Proposed Rule . . . [which] states, "CBE changes are not available for generic drugs approved under an abbreviated new drug application under 21 U.S.C. 355(j). To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug." *Morris,* 642 F. Supp. 2d at 685 (citing Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 2848, 2849).

Accordingly, the generic manufacturer must have labeling that is "the same as"

- -                                                                                                                                                  11

the labeling of the brand manufacturer at the time its submits its ANDA.  In the event the brand manufacturer avails itself of the CBE process to change its labeling, then so too must the generic manufacturer make the identical changes in order that its labeling be "consistent with" that of the brand manufacturer.  But, in no event, may a generic manufacturer avail itself of the CBE process to make its own, unilateral changes to comply with state law failure to warn requirements without running afoul of the federal "same as" and "consistent with" requirements.

Whether in light of these carefully crafted federal restrictions a generic manufacturer can be held liable under state law for a purported failure to strengthen a generic drug's warning is precisely the question that the U.S. Supreme Court seeks to answer in *Actavis Elizabeth, LLC v. Gladys Mensing*, No. 09-1039, 131 S.Ct. 817 (U.S. 2010).[6]  Given that the U.S. Supreme Court granted certiorari to determine this issue regardless of the fact that 1) there is no current circuit split and 2) the U.S. Solicitor General recommended the Court decline review until such a split arises, indicates that the High Court is likely concerned with the serious policy ramifications of holding generic manufacturers liable, ramifications that may include destruction of uniformity between brand and generic drugs, a potential increase in the costs and a decrease in the availability of generic drugs, and the imposition of a greater burden on the FDA.  The stated purpose of Hatch-Waxman Act is to ensure that much needed lower costing drugs are available to consumers.  In other words, " 'to get generic drugs into the hands of

---

[6] The question presented by the U.S. Supreme Court is specifically crafted as follows: The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Amendments" to the Food, Drug and Cosmetic Act (FDCA)) and its implementing regulations require a generic drug manufacturer to maintain the labeling for a generic the "same as" the labeling for the "brand" or "listed" drug that is its bioequivalent.  See 21 U.S.C. 9 §355(j)(2)(A)(iv-v); 21 C.F.R. § 314.94(a)(8).  The question presented is whether the Eighth Circuit Court of Appeals misinterpreted that requirement and the doctrine of conflict preemption when it concluded that generic drug manufacturers could be held liable under state law for failing to strengthen the warnings in the labeling for the generic drug.

patients at reasonable prices - fast.' " *Andrx Pharms., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 809 (D.C. Cir. 2001) (quoting *In re Barr Labs., Inc.,* 930 F.2d 72, 76 (D.C. Cir. 1991)).

To that end, the Hatch-Waxman Act set up a regulatory scheme treating generic manufacturers differently than brand manufacturers, *i.e.,* an abbreviated approval process that does not require the expensive analysis required by the pre- and post-NDA process but, instead, requires proof that the drug and the labeling are the same as and that they will stay the same as the brand manufacturer's labeling. Indeed, one of the stated policies behind the federal labeling laws and regulations is to avoid "overwarning" and thereby limit the availability of necessary and beneficial drugs and/or preclude physicians and pharmacies from relying upon the fact that the generics are, in essence, the same product when making prescribing decisions, which unilateral "stronger" or "additional" warnings would clearly have the potential to do. A decision against preemption for generic manufacturers in effect would impose upon generic manufacturers a requirement to incur substantial expenses keeping up with state law failure to warn lawsuits. Such a decision would defeat the very purpose of the Hatch-Waxman Act to ensure available, less expensive drugs -- a policy reiterated during the recent Health Care debate and meriting attention and concern by U.S. Supreme Court today.

Because a generic manufacturer may not unilaterally change its labeling under the CBE process, it is impossible for Lupin to both comply with federal law and regulations and, at the same time, unilaterally make "stronger" or "additional" warnings as Plaintiffs seek pursuant to their theories of recovery. Accordingly, because the Amended Complaint and each of the counts/theories of recovery asserted therein are

preempted by federal law and cannot be cured by amendment, the Amended Complaint must be dismissed with prejudice.

## IV.   CONCLUSION

For the reasons stated herein, Lupin respectfully requests that the Amended Complaint be dismissed in its entirety with prejudice on the grounds of federal preemption.

>Respectfully submitted,
>
> /s/ Craig L. Johnson
>Craig L. Johnson
>WHONSETLER & JOHNSON, PLLC
>11901 Brinley Avenue
>Louisville, KY  40243
>(502) 895-2297
>*Counsel for Defendant*
>  *Lupin Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February ___, 2011, a copy of the foregoing **MEMORANDUM IN SUPPORT OF LUPIN PHARMACEUTICALS, INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this filing through the Court's electronic filing system.

Clerk, U.S. District Court
Ashland Division
3rd Floor, Carl D. Perkins Federal Building
1405 Greenup Avenue
Ashland, KY 41101

Lee L. Coleman, Esq.
Hughes & Coleman
Legal Arts Building, Suite 110
200 South 7th Street
Louisville, KY 40202
lcoleman@hughesandcoleman.com

Thomas Anapol, Esq.
Gregory Spizer, Esq.
Anapol Schwartz Weiss Cohan Feldman & Smalley PC
1710 Spruce Street
Philasdelphia, PA 19103
tanapol@anapolschwartz.com
gspizer@anapolschwartz.com

Barry Hill, Esq.
Anapol Schwartz Weiss Cohan Feldman & Smalley, PC
89 12th Street
Wheeling, West Virginia 26003
bhill@anapolschwartz.com


/s/ Craig L. Johnson
Craig L. Johnson, Esq.